UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
RUBY VEGA,                      )
             Plaintiff,         )
                                )
        v.                      )    CIVIL ACTION
                                )    NO. 14-13900-WGY
CAROLYN W. COLVIN,              )
Acting Commissioner, Social     )
Security Administration,        )
                                )
             Defendant.         )
_____)
```

YOUNG, D.J.                                    March 2, 2016

**MEMORANDUM & ORDER**

## I.   INTRODUCTION

This is an action under section 205(g) of the Social

Security Act, 42 U.S.C. § 405(g).  Compl. ¶ 1, ECF No. 1.  The

Plaintiff Ruby Vega seeks review of the denial of her

applications for social security disability insurance benefits

("SSD") and supplemental security income payments ("SSI")

(together, "benefits") by the Acting Commissioner of the Social

Security Administration ("Commissioner").  Id. ¶¶ 1, 12.  Vega

argues that the decision of the Administrative Law Judge (the

"hearing officer")[1] denying her benefits is not supported by

---

[1] Such nomenclature in no way conveys any disrespect for the
dedicated men and women who perform this difficult adjudicatory
task.  Rather it is simply a way of noting that these government

---

employees are subjected to intense pressures with few of the
protections accorded our independent judiciary.

> With pressure from Congress to reduce its
> expenditures, the SSA has been forced to look for ways
> to cut its costs.  It has done so, in part, by
> spending decades pressuring [hearing officers] to
> reduce their approval rates while ignoring the ALJs
> with unusually low approval rates.  To further reduce
> awards of benefits, the SSA instituted an appeals
> process that is so inaccurate and flawed that almost
> half of its decisions are reversed or remanded by the
> federal courts, which often use scathing language when
> doing so.

Jacob Bender, Note, Torn Between Two Masters: Flaws in the
Social Security Disability Process, 45 U. Tol. L. Rev. 619, 646
(2014) (footnotes omitted).  For examples of this pressure, see,
for example, Staff H.R. Comm. on Oversight and Gov't Reform,
113th Cong., Systemic Waste and Abuse at the Social Security
Administration: How Rubber-Stamping Disability Judges Cost
Hundreds of Billions of Taxpayer Dollars 3 (2014) ("ALJs have
enormous spending authority, magnifying the consequences of any
improper decision-making.").  The press has occasionally covered
the tension between reducing delays and preserving adequate due
process protections for applicants.  See Kelli Kennedy, Some
Struggle to Live While Waiting More Than 2 Years for Social
Security Disability Hearings, U.S. News, (Nov. 28, 2015, 11:00
AM), http://www.usnews.com/news/us/articles/2015/11/28/long-
wait-times-plague-social-security-disability-process ("Fort
Myers [hearing officer] Larry Butler said [hearing officers] who
took the time to comb over the sometimes hundreds of pages of
medical documents to reach a decision were put on the radar for
discipline for not approving cases fast enough . . . . Overall
approval rates have decreased from 56 percent to 44 percent this
year, according to the agency, but some of the raw data was not
made public and could not be verified.").  This tension is also
present in the Securities and Exchange Commission enforcement
context.  See, e.g., The SEC's Kangaroo Courts, BloombergView,
(Oct. 27, 2015, 7:00 AM),
http://www.bloombergview.com/articles/2015-10-27/the-sec-s-
strange-justice (suggesting that defendants in the SEC
enforcement proceedings should have an option to choose between
the SEC proceedings and the district court); cf. Flannery v.
S.E.C., 810 F.3d 1 (1st Cir. 2015) (reversing the Commission's
decision because it lacked substantial evidence to support it).

substantial evidence and is contrary to law.  Id. ¶ 13.  She
requests that this Court reverse the Commissioner's decision and
grant her the benefits for which she applied.  Id. ¶¶ 13-14.
The Commissioner argues that the hearing officer's factual
findings are supported by substantial evidence and are
conclusive, Def.'s Answer 3, ECF No. 7, and accordingly requests
that this Court enter judgment affirming the Commissioner's
decision, Def.'s Mot. Order Affirming Decision Comm'r, ECF No.
13.

      Although this Court owes appropriate deference to the
hearing officer's decision, in this case it suffers from a
fundamental flaw that calls for vacatur.  Instead of supporting
his determinations regarding the weight accorded to Vega's
treating physicians' testimony, Vega's credibility, and her
residual functional capacity with reference to expert opinion,
the hearing officer here improperly took it upon himself to
interpret the underlying medical evidence itself.  This flaw

---

Apparently, business executives have more clout with Congress
than do social security disability applicants.  See Due Process
Restoration Act of 2015, H.R. 3798, 114th Cong. (2015)
(proposing that respondents in Securities and Exchange
Commission enforcement proceedings may elect to have matter
tried in the district courts where the rules of evidence apply
and the parties retain their constitutional right to a jury).
Maybe the way political campaigns are currently funded has
something to do with this.  Cf. Lawrence Lessig, Republic Lost
132-33 (2011) (noting seventy-five percent of Americans believe
that "campaign contributions buy results in Congress").

underlies each of the three errors that Vega identifies.
Because the hearing officer was not empowered to draw
conclusions about Vega's functional capabilities on the basis of
his independent analysis of her examination results and clinical
findings contained in her medical records, the Court holds that
his decision is not supported by substantial evidence.

### A.   Procedural Background

Vega applied for both SSD and SSI benefits on January 10,
2012.  SSA Admin. R. Soc. Sec. Procs. ("Admin. R.") 213, 215,
ECF No. 8.[2]  On February 28, 2012, the Social Security
Administration ("Administration") denied her application.  Id.
at 131.  Vega filed a request for reconsideration on April 12,
2012, id. at 144, and the Administration again determined that
Vega was not entitled to benefits, id. at 147.

Vega requested a hearing and appeared before a hearing
officer on August 7, 2013.  Id. at 33.  On September 20, 2013,
the hearing officer issued a decision finding that Vega was not
disabled for the purpose of sections 216(i), 223(d), and
1614(a)(3)(A) of the Social Security Act and accordingly denied
her application for benefits.  Id. at 12-26.  Vega filed a

---

[2] The record of the administrative proceedings in this case
is split across several docket entries, labeled 8-1 through 8-
11.  For the sake of clarity, this memorandum will cite to page
numbers in the continuously paginated record as a whole rather
than to individual docket entries that correspond to parts of
the record.

request for review of the hearing officer's decision, <u>id.</u> at 10,

which the Commissioner denied on August 29, 2014, <u>id.</u> at 1.

On October 20, 2014, Vega filed a complaint in this Court

seeking review of the Commissioner's decision pursuant to

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Compl. ¶ 1.  The Commissioner filed an answer, Def.'s Answer,

along with a certified copy of the transcript of the

administrative record, Admin. R., on December 22, 2014.

Thereafter, on February 2, 2015, Vega filed a motion for

judgment on the pleadings, Pl.'s Mot. J. Pleadings, ECF No. 9,

and a supporting memorandum, Mem. Supp. Mot. J. Pleadings, ECF

No. 10 ("Pl.'s Mem.").  On April 16, 2015, the Commissioner

moved for an order affirming its decision, Def.'s Mot. Order

Affirming Decision Comm'r, ECF No. 13, and filed a supporting

memorandum, Mem. Supp. Mot. Order Affirming Decision Comm'r

("Def.'s Mem."), ECF No. 14.

**B.   Factual Background**

Vega was born on September 19, 1969.  Admin. R. 213.  At

various times in the past she was employed as a billing clerk,

admission clerk, insurance clerk, and customer service

representative.  <u>Id.</u> at 68-69, 242, 252.  Vega has not worked

since April 2009, when she was laid off.  <u>Id.</u> at 241.

Vega claims her conditions became disabling in July 2011.

<u>Id.</u>  She points to a number of purportedly debilitating

conditions.  First, Vega suffers from a cervical disc disease
that causes her severe pain originating in her neck and back and
extending throughout her body.  Id. at 249-51, 270-72, 492.
Second, she has been diagnosed with fibromyalgia, which causes
her to experience chronic neck and back pain as well as
stiffness and weakness in her joints.  Id. at 771-74.  Third,
Vega suffers from anxiety and has panic attacks as a result of
her severe pain.  Id. at 430-31.

Vega saw several specialists, underwent a battery of
clinical tests, and pursued various courses of treatment in an
effort to resolve her medical conditions or at least manage her
symptoms.  Her primary treating physicians were neurosurgeon Dr.
James Tiesi, who addressed Vega's cervical spondylosis, and
rheumatologist Dr. Ginge DeSilva, who treated her fibromyalgia.
Vega also saw a nurse practitioner, who diagnosed her with
anxiety.  Id. at 430.  Per her doctors' recommendations, Vega
underwent physical therapy and was administered tender point
injections for her pain.  Id. at 330, 344-66, 370-73.  Vega also
saw a chiropractor, id. at 643-56, and took a number of
medications to help manage both her pain and her resultant
anxiety, see id. at 499, 505-06, 511, 515-16, 520-21.

The record contains myriad examination results and clinical
observations.  Certain reports indicate "mild" or "normal"
findings and improvements in Vega's condition, see, e.g., id. at

[6]

615-16, 710-12, 852-53, while others list significant abnormalities and chronicle the worsening of her symptoms, see, e.g., id. at 331-32, 336-37, 463, 873.[3]  The record also contains medical opinions from Vega's treating sources as to the functional implications of her impairments, which the Court discusses in detail given their significance in this case.

### 1.  Dr. Tiesi

Neurosurgeon Dr. Tiesi completed a "Spinal Impairment Questionnaire" on July 24, 2012.  Admin. R. 492-98.  In it, Dr. Tiesi diagnosed Vega with both cervical spondylosis and probable rheumatologic disease.  Id. at 492.  He noted her prognosis was "fair/good" and claimed that his "clinical findings" supported his diagnoses, specifically noting Vega's cervical tenderness and limited range of motion.  Id.  He went on to state that Vega reported daily muscular and soft tissue pain in her neck, shoulders, and extremities, id. at 494, that medications had not worked to completely eliminate her pain, id. at 495, and that Vega's impairments are "ongoing" such that they are likely to persist for at least one year, id. at 496.  Dr. Tiesi indicated that Vega's symptoms and limitations were not "reasonably

---

[3] Unsurprisingly, Vega in her recitation of the factual background of this case highlights those tests and reports indicating abnormal or severe results, see Pl.'s Mem. 2-12, while the Commissioner calls attention to mild or normal findings, see Def.'s Mem. 3-8.

consistent" with the impairments detailed in the questionnaire, noting that she had "more symptoms than expected from MRI findings[.]"  Id. at 494.

As for specific functional limitations, Dr. Tiesi found that Vega could sit for 8 hours in a day, though not continuously.  Id. at 495.  He indicated that she could stand or walk for 4 hours per day.  Id.  Dr. Tiesi reported that Vega could lift or carry 0-5 pounds frequently, and 5-50 pounds occasionally.  Id. at 495-96.  He stated that Vega's condition would interfere with her ability to maintain her neck in a single position, but that she could perform a job that required this so long as she had "appropriate breaks[.]"  Id. at 497. Finally, he opined that Vega's conditions would likely cause her to have "'good days' and 'bad days[,]'" and to miss work more than three times per month.  Id.

Per his letter accompanying this questionnaire, Dr. Tiesi's evaluation was based exclusively on Vega's cervical spondylosis diagnosis, even though it appeared she suffered from additional impairments.  See id. at 491.  He noted that while physical therapy and pain management injections at first seemed to improve her condition, she subsequently reported worsening conditions, at which point "[h]er symptoms . . . were out of line with her diagnosis of cervical spondylosis and more

[8]

consistent with a rheumatologic disease." Id. Dr. Tiesi

concluded:

> From a neurosurgical standpoint [Vega] has
> cervical spondylosis which may limit her
> activities at times due to symptoms of neck pain
> and decreased range of motion.  Her other
> symptoms however I will have to defer to
> rheumatology as far as prognosis and limitations.
> From a neurosurgical viewpoint I see no reason
> the patient cannot return to full-time work as
> her cervical spondylotic findings are not severe
> at this time.

Id.

### 2.  Dr. DeSilva

Rheumatologist Dr. DeSilva completed a "Fibromyalgia

Impairment Questionnaire" on July 31, 2012.  Id. at 575-80.  Dr.

DeSilva diagnosed Vega with fibromyalgia, cervical spondylosis,

lumbar spondylosis, and bilateral shoulder tenderness, with a

prognosis of "[g]uarded[.]"  Id. at 575.  Dr. DeSilva supported

these diagnoses with reference to clinical findings

(fibromyalgia tender points, range of motion) and MRIs.  Id. at

575-76.  She noted that Vega's impairments and limitations were

"reasonably consistent" with the impairments reported in the

questionnaire.  Id. at 576.

Dr. DeSilva reported that Vega had "constant" pain in her

lumbosacral spine, cervical spine, thoracic spine, chest,

shoulders, arms, hands, fingers, hips, legs, knees, ankles, and

feet, and that the pain rated 10 out of 10 in severity.  Id. at

576-77.  With respect to functional limitations that would
affect Vega's ability to work, Dr. DeSilva found that Vega could
sit for 1 hour in an 8-hour workday and could stand or walk for
0-1 hours.  Id. at 578.  She indicated the Vega should not or
could not sit continuously (she would need to get up every 30-45
minutes for 5-10 minutes), nor could she stand or walk
continuously.  Id.  Dr. DeSilva stated that Vega could lift or
carry 0-10 pounds occasionally, and could never lift or carry
over 10 pounds.  Id.  Finally, Dr. DeSilva found that Vega would
be likely to have "'good days' and 'bad days'" and miss work in
excess of three times per month.  Id. at 579.[4]

     Dr. DeSilva supplemented her questionnaire with a letter on
August 14, 2012, in which she stated that Vega was "100%
medically disabled" and "unable to work" as a result of her
impairments, which include "constant pain[.]"  Id. at 581.

**II.  THE HEARING OFFICER'S DECISION**

     The hearing officer found that Vega "meets the insured
status requirements of the Social Security Act through December
31, 2014," and did not perform any substantial gainful activity
after the alleged onset date in July 2011.  Id. at 17.  He then
found that Vega had several impairments listed as "severe" under

---

     [4] Dr. DeSilva also indicated that "emotional factors"
contributed to the severity of Vega's impairments, and that she
would be limited to a low stress job.  Admin. R. 578-79.

Administration regulations -- including "degenerative disc disease of the cervical, thoracic, and lumbar spines; fibromyalgia; and anxiety disorder" -- as well as "non[-]severe" impairments including hip bursitis and mitral valve prolapse. Id. at 17-18.

To determine Vega's "residual functional capacity," the hearing officer stated that he considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence or other evidence." Id. at 19-20. The hearing officer evaluated Vega's credibility, concluding that Vega's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Id. at 20. He also assessed the reliability of the expert opinion evidence of the various treating physicians and medical consultants. See id. at 23-24. He found the opinions of treating neurosurgeon Dr. Tiesi and psychological consultant Michelle Butler were entitled to "great weight" because they were "generally consistent with the record as a whole." Id. at 23-24. The hearing officer rejected the portion of Dr. Tiesi's opinion that stated that Vega would likely miss more than 3 days of work per month, however, noting that Dr. Tiesi failed to explain the basis for this conclusion.

[11]

See id. at 23.   The hearing officer accorded "little weight" to

the opinions of treating rheumatologist Dr. DeSilva,

chiropractor Jeffrey Price, and medical consultants Donald

Morford and Cassandra Comer, finding them "inconsistent with the

record as a whole[.]"   Id.

The hearing officer defined Vega's residual functional

capacity as follows:

> [Vega] has the residual functional capacity to perform
> less than the full range of light work as defined in
> 20 CFR 404.1567(b) and 416.967(b). [Vega] can lift
> and/or carry 20 pounds occasionally and 10 pounds
> frequently; can stand and/or walk for 6 hours in an 8-
> hour workday; can sit for 6 hours in an 8-hour
> workday; can occasionally climb, balance, stoop,
> kneel, crouch, and crawl; can perform frequent
> reaching in all directions; must avoid work hazards
> such as unprotected heights; and is limited to
> unskilled work involving simple work instructions.

Id. at 19.   He concluded that this level of residual functional

capacity rendered Vega incapable of performing any of the work

she has done in the past, but that there existed jobs "in

significant numbers in the national economy" that Vega was

capable of performing, in spite of her impairments.   Id. at 24-

25.   To make this determination, the hearing officer relied on

the testimony of a vocational expert, who testified that a

person with Vega's profile (specifically her residual functional

capacity) could perform jobs such as cashier II and furniture

rental consultant as well as various sedentary jobs, of which

there were many in both the national economy and in Florida,

where Vega resided.  Id. at 25.  Accordingly, the hearing

officer concluded that Vega "has not been under a disability, as

defined in the Social Security Act, from July 1, 2011, through

the date of this decision[.]"  Id.

**III. LEGAL STANDARD**

**A.    Standard of Review**

This Court may alter the decision of the Commissioner only

if "[she] has committed a legal or factual error in evaluating a

certain claim."  Manso-Pizarro v. Sec'y of Health & Human

Servs., 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v.

Hudson, 490 U.S. 877, 885 (1989)).  Factual findings must be

upheld so long as they are supported by substantial evidence and

the hearing officer applied the proper legal standard.  Seavey

v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001).  The Supreme Court

has defined "substantial evidence" as "more than a mere

scintilla" and enough such that "a reasonable mind might accept

[it] as adequate to support a conclusion."  Richardson v.

Perales, 402 U.S. 389, 401 (1971) (internal quotation marks

omitted).  Legal conclusions are subject to de novo review.

Seavey, 276 F.3d at 9.

**B.    Social Security Disability Standard**

For the purpose of determining eligibility for benefits, a

person is disabled if he or she is incapable of "engag[ing] in

any substantial gainful activity by reason of any medically

determinable physical or mental impairment which . . . has

lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. § 423(d)(1)(A). Administration

regulations set forth a five-part process for determining

whether a person is disabled:

> 1) if the applicant is engaged in substantial gainful
> work activity, the application is denied; 2) if the
> applicant does not have, or has not had within the
> relevant time period, a severe impairment or
> combination of impairments, the application is denied;
> 3) if the impairment meets the conditions for one of
> the 'listed' impairments in the Social Security
> regulations, then the application is granted; 4) if
> the applicant's 'residual functional capacity' is such
> that he or she can still perform past relevant work,
> then the application is denied; 5) if the applicant,
> given his or her residual functional capacity,
> education, work experience, and age, is unable to do
> any other work, the application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920). The

individual seeking benefits bears the burden of proof with

respect to the first four steps; the burden then shifts to the

Commissioner at step five of the inquiry. Bowen v. Yuckert, 482

U.S. 137, 146 n.5 (1987); Aguiar v. Apfel, 99 F.Supp.2d 130, 132

(D. Mass. 2000) (Tauro, J.).

**IV.  ANALYSIS**

Vega challenges the Commissioner's decision on three

grounds. First, she argues that the hearing officer failed to

accord proper weight to the opinion of treating physician Dr.

DeSilva. Pl.'s Mem. 13-16. Second, she argues that the hearing

officer erred in his evaluation of Vega's credibility.  Id. at
16-19.  Finally, she argues that the hearing officer's reliance
on a vocational expert's testimony was misplaced.  Id. at 19-20.
The Court addresses each of these arguments in turn, though a
common thread runs through its analyses: that of the role of
expert testimony in informing a hearing officer.

>    A.    **Weight Given to Medical Opinion Evidence**

Vega argues that the hearing officer (and by extension, the
Commissioner) erred by assigning "little weight" to the opinion
of treating rheumatologist Dr. DeSilva.  Id. at 13-16.  The
opinions of treating physicians are merit "more weight" since
these physicians "are likely to be the medical professionals
most able to provide a detailed, longitudinal picture of [a
claimant's] medical impairment(s) and may bring a unique
perspective to the medical evidence that cannot be obtained from
the objective medical findings alone or from reports of
individual examinations[.]"  20 C.F.R. § 404.1527 (c)(2).  Where
the treating physician's opinion is "well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is
not inconsistent with the other substantial evidence in the case
record[,]" it entitled to controlling weight, id., meaning its
medical conclusions must be adopted by the hearing officer.  If
the hearing officer finds that according the opinion controlling
weight is not warranted, the officer is still obliged to

[15]

consider the following factors to determine how much weight

ought be given to the treating physician's opinion:

> 1) the length of the treatment relationship and the
> frequency of examination; 2) the nature and extent of
> the treatment relationship; 3) the relevant evidence
> in support of the medical opinion; 4) the consistency
> of the medical opinions reflected in the record as a
> whole; 5) whether the medical provider is a specialist
> in the area in which he renders his opinions; and 6)
> other factors which tend to support or contradict the
> opinion.

Guyton v. Apfel, 20 F.Supp.2d 156, 167 (D. Mass. 1998) (citing

20 C.F.R. § 404.1527(d)(2)).  Hearing officers must consider all

six factors, Bazile v. Apfel, 113 F.Supp.2d 181, 188 (D. Mass.

2000), and "give good reasons . . . for the weight [given to a]

treating source's opinion," 20 C.F.R. § 404.1527(d)(2).  This

does not, however, require them to discuss each factor in great

detail.  See Green v. Astrue, 558 F.Supp.2d 147, 155 (D. Mass.

2008).

Here, the hearing officer found that Dr. DeSilva's opinion

was entitled to "little weight because it is inconsistent with

the record as a whole."  Admin. R. 23.  In particular, the

hearing officer observed that Dr. DeSilva's statement indicating

that Vega was "100% medically disabled" and "unable to work[,]"

id. at 581, was "inconsistent with [Vega's] conservative

treatment history and the effectiveness of [Vega's] treatment in

controlling her symptoms," id. at 23.

While a hearing officer may consider a claimant's responsiveness to a conservative course of treatment, the fact of Vega's conservative treatment cannot itself undermine her doctor's opinion that she is disabled.  Compare Blackette v. Colvin, 52 F.Supp.3d 101, 120-21 (D. Mass. 2014) (concluding that substantial evidence supported hearing officer's credibility determination, where hearing officer considered claimant's improvement in response to conservative treatment), with Roeschlaub v. Comm'r of Social Sec., 27 F.Supp.3d 211, 222 (D. Mass. 2014) (Collings, M.J.) (rejecting hearing officer's finding that treating physician's assessment of claimant's disability was controverted by evidence of claimant's conservative treatment, where "nothing in the record . . . indicate[s] that the [claimant's] course of treatment has somehow been inadequate or inappropriate").

To support his findings, the hearing officer here cited physical therapy records indicating that Vega "stated her 'exercises really help[.]'"  Admin. R. 22.  But Vega's full statement in that record is: "It always hurts all along my spine but the exercises really help."  Id. at 864.  It is difficult to see how this statement, in full, is inconsistent with Dr. DeSilva's professional opinion that Vega is too disabled to work.  The other instances the hearing officer cites as

[17]

indications that Vega's conditions improved with treatment are
plagued by similarly contradictory evidence.[5]

Perhaps more troubling, the apparently inconsistent
evidence upon which the hearing officer relies to discount Dr.
DeSilva's opinion comes in the form of raw medical evidence, not
expert opinion.  See Manso-Pizarro v. Sec'y of Health and Human
Servs., 76 F.3d 15, 17 (1st Cir. 1996) ("With a few exceptions .
. . [a hearing officer], as a lay person, is not qualified to
interpret raw data in a medical record."); Roeschlaub, 27
F.Supp.3d at 222 ("[I]t simply was not within the [hearing
officer's] province to rely on her own interpretation of [the
claimant's] course of treatment to reach what is essentially a
medical opinion that is at odds with that of her treating
physician.").  Absent some medical expert opinion indicating

---

[5] The hearing officer notes that Vega's physical therapy
records indicate some improvement, see Admin. R. 22 ("[P]hysical
therapy progress notes dated October 10, 2011, show the claimant
reported decreased pain with treatment[.]"), but fails to
acknowledge that in the same set of records, Vega reports that
her "pain decreases for ~30 minutes after PT," id. at 359, and
that she continued to experience pain in her neck and felt that
her arm was "getting weaker and weaker[,]" id. at 363.
    The hearing officer also found Dr. DeSilva's opinion that
Vega could stand or walk for no more than an hour was
inconsistent with a June 2012 report that showed Vega "had full
range of motion in her hips, knees, ankles, and toes, and her
gait and station were normal upon examination[.]"  Id. at 23.
That same report, however, included findings that are not
inconsistent with Dr. DeSilva's opinion: "[c]ervical spine pain
was elicited by motion[,]" "[p]alpation of the lumbosacral spine
revealed abnormalities[,]" and "[l]umbosacral spine pain was
elicited by motion."  Id. at 263.

that Vega's treatment "somehow negates, or is inconsistent with"
Dr. DeSilva's determination as to Vega's functional limitations,
id., the hearing officer was not entitled to reject Dr.
DeSilva's conclusions on the ground that she showed some
response to treatment.

The only expert opinion that might support the hearing
officer's decision largely to discredit Dr. DeSilva is that of
Dr. Tiesi, who opined that Vega's condition was not severe and
that she could return to work.  Admin. R. 491.  Dr. Tiesi's
opinion cannot be read as inconsistent with that of Dr. DeSilva,
however, because Dr. Tiesi explicitly declined to opine on the
full range of Vega's symptoms and their functional implications.
See id.  Because the hearing officer here accorded Dr. DeSilva's
opinion little weight on the basis of supposed inconsistencies
that are not supported by the record, the Court concludes that
the hearing officer failed to provide "good reasons" for
according Dr. DeSilva's opinion little weight, and therefore
that his decision to do so was not supported by substantial
evidence.[6]

---

[6] The Court also takes issue with the hearing officer's
decision to discredit the portion of Dr. Tiesi's opinion that
indicates that Vega would likely miss more than three days of
work per month.  Although the hearing officer was not required
to embrace Dr. Tiesi's opinion wholesale, see Perez v. Sec'y of
Health and Human Servs., 958 F.2d 445, 447 (1st Cir. 1991) (per
curiam), his reason for rejecting this part of Dr. Tiesi's
opinion is inadequate.  The hearing officer stated that Dr.

B.    **Evaluation of Vega's Credibility**

Vega argues next that the hearing officer erred in his determination that Vega's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." Admin. R. 20; Pl.'s Mem. 16-19. Specifically, she argues that the hearing officer failed to evaluate "the combined impact of all of [her] impairments," and further that his opinion lacks due consideration for the various factors set forth in Administration regulations and rulings. Pl.'s Mem. 18-19.

A hearing officer's credibility assessment involves two steps. See Amaral v. Comm'r of Social Security, 797 F.Supp.2d 154, 161 (D. Mass. 2010). First, the hearing officer must establish whether a claimant has "a medically determinable impairment(s) that could reasonably be expected to produce [his or her] symptoms." 20 C.F.R. § 404.1529(b). If the hearing officer concludes that such impairment exists, she then proceeds

---

Tiesi "offers no explanation why he believes [Vega] would need to be absent [at least 3 days per month]." Admin. R. 23. Under these circumstances, the hearing officer had a duty to attempt to fill in this gap by contacting Dr. Tiesi. See Gaeta v. Barnhart, No. 06-10500-DPW, 2009 WL 2487862 at *5 (D. Mass. Aug. 13, 2009) (Woodlock, J.) ("If the evidence does not support a sources' opinion and the ALJ cannot ascertain the basis for the source's opinion, the ALJ has an obligation to 'make every reasonable effort' to recontact the source for clarification.") (quoting Social Security Ruling 96-5P, 1996 WL 374183 at *6 (July 2, 1996)).

to "evaluate the intensity and persistence of [those] symptoms"
in order to determine the extent to which they limit the
claimant's ability to work.  20 C.F.R. § 404.1529(c).  This
necessarily involves consideration of "objective medical
evidence" as well as evidence submitted by the claimant
concerning the claimant's "daily activities;" the "location,
duration, frequency, and intensity" of the symptoms;
"precipitating and aggravating factors;" and any treatment the
claimant has used for his or her symptoms (including medications
and other forms of treatment or practical measures).  Id.; see
also Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29
(1st Cir. 1986).

On review, this Court must ask "(1) whether there is
sufficient evidence to show that the hearing officer properly
addressed all of [Vega's] subjective allegations, and (2) if so,
whether he followed the proper procedure for assessing pain and
credibility."  Green v. Astrue, 588 F.Supp. 2d 147, 156 (D.
Mass. 2008).  When a hearing officer does not fully credit a
claimant's statements about his or her pain or other symptoms,
the hearing officer is required to make "specific findings as to
the relevant evidence he considered in determining to disbelieve
the [claimant]."  Da Rosa v. Sec'y of Health and Human Servs.,
803 F.2d 24, 26 (1st Cir. 1986).

Vega claims she suffers from (among other things) chronic and severe pain, stiffness, and weakness in her neck, shoulders, and back, Admin. R. 249, along with "stabbing, throbbing, shooting pains" throughout her body, id. at 270.  She reports that she is unable to "fully turn [her] head" without "extreme pain[,]" and that "repeated movements" exacerbate the symptoms in her neck, shoulders, and back as well as her headaches.  Id. at 249-50.  Vega testified that she spends most of her days attending various medical appointments, which she travels to and from using Medicaid transportation.  Id. at 43.  When she is home, she said, she performs light housework, but has to take frequent breaks because of her pain and fatigue.  Id. at 44. She testified that she can sit for thirty minutes before she has to stand, and vice versa, because of the pain.  Id. at 62.  She requires help from her children to perform most day-to-day tasks, and her near-constant pain causes her severe anxiety that manifests in the form of panic attacks.  See id. at 56-63.

The hearing officer declined fully to credit Vega's subjective reports of her symptoms.  Id. at 20.  The hearing officer explained that Vega's "medical records, diagnostic tests, and clinical presentations are inconsistent with disabling neck pain[,] . . . disabling back pain[,] . . . [and] disabling fatigue, diffuse body pain, and other symptoms from her fibromyalgia."  Id. at 21.  Further, he concluded that

[22]

Vega's "medical records, her clinical presentations, and the effectiveness of her medications are inconsistent with disabling symptoms from her anxiety disorder." Id. at 22.

Examination of this portion of the hearing officer's opinion reveals that his determination that Vega was not wholly credible primarily is based on his analysis of objective medical evidence. See id. at 21-22.[7] The hearing officer's credibility determination thus suffers from the same flaw as does his assessment of the expert opinion evidence -- namely, as a layperson, the hearing officer was not entitled to draw his own inferences regarding the functional implications of pure medical findings and use those inferences to discredit Vega's testimony.

_____

[7] The hearing officer cites a number of medical records indicating various "negative" or "normal" test results. Admin. R. 21. For example, the hearing officer states:

> [T]he thoracic spine MRI report dated February 14, 2013, shows [Vega's] thoracic spine vertebral body heights were preserved; her thoracic spinal cord had normal signal intensity; she had disc extrusion at T6-T7 causing only 'borderline' spinal canal narrowing and ventral cord flattening with no significant neural foraminal narrowing; and she had disc protrusion at T7-T8 causing only 'minimal' right ventral cord flattening without significant spinal canal or neural foraminal narrowing[.]

Id. What does any of this mean? The hearing officer does not say; rather, he takes for granted that it undermines Vega's subjective reports of her symptoms, despite the fact that her own treating physician, interpreting these same results, arrives at the opposite conclusion, see id. at 617-23.

See Aguiar v. Apfel, 99 F.Supp.2d 130, 135 (D. Mass. 2000)
(Tauro, J.) ("It is not permissible for the [hearing officer] to
pick and choose technical language from medical evaluations and
draw conclusions that are unsupported, or indeed, contradicted
by the functional limitations discussed.") (citing Nguyen v.
Chater, 172 F.3d 31, 35 (1st Cir. 1999).[8]

The hearing officer goes on to address the type and
effectiveness of Vega's treatment.  Admin. R. 22.  Under Avery,
this was appropriate, 797 F.2d at 29; however, as discussed
above, the hearing officer's characterization of Vega's response

---

[8] The hearing officer seems to suggest, albeit somewhat
indirectly, that the opinions of Dr. Tiesi and Dr. Jacob Patrick
support his adverse credibility finding.  Admin. R. 22-23.  The
hearing officer notes that "[Dr. Tiesi] opined that [Vega] can
sit for 8 hours per day, stand and walk for 4 hours in an 8-hour
workday and lift up to 50 pounds occasionally."  Id. at 23.  In
his report accompanying these findings, however, Dr. Tiesi
specifically notes that his assessment is limited to symptoms
arising out of Vega's cervical spondylosis.  See Admin. R. 491.
That Vega would suffer other or more intense symptoms due to her
fibromyalgia is therefore not inconsistent with Dr. Tiesi's
opinion.
     As for Dr. Jacob, the extent of his assessment of Vega's
functional capacities is his comment under "Treatment Options"
recommending "limited activities with no heavy lifting or
strenuous activities[.]"  Admin. R. 712.  A comment at this
level of generality, by a specialist whose own credibility is
uncertain (the hearing officer fails to indicate how much weight
he assigned to Dr. Jacob's opinion), is insufficient to support
the hearing officer's finding about the (lack of) veracity of
Vega's testimony.

to treatment and the inferences he draws therefrom, are not, <u>see</u>
<u>supra</u> part IV(A); <u>Aguiar</u>, 99 F.Supp.2d at 134-45.[9]

None of the remaining <u>Avery</u> factors -- namely "[t]he
nature, location, onset, duration, frequency, radiation, and
intensity of pain; [p]recipitating and aggravating factors (e.g.
movement, activity, environmental conditions); . . .
[f]unctional restrictions; and [Vega's] daily activities[,]"
<u>Avery</u>, 797 F.2d at 29 -- are covered in the hearing officer's
analysis of Vega's credibility.  While the hearing officer was
not required to "expressly discuss every enumerated factor[,]"
<u>Balaguer</u> v. <u>Astrue</u>, 880 F.Supp.2d 258, 268 (D. Mass. 2012), he
was required to evaluate relevant nonmedical evidence and
explain with adequate specificity why Vega's reports of her
symptoms were not credited.[10]  Accordingly, the hearing officer's

_____

[9] The hearing officer also considers the fact that Vega's
unemployment was due, originally, "to a business-related layoff
rather than . . . her allegedly disabling impairments," Admin.
R. 22.  The Court agrees with Vega that the fact that Vega left
the workforce due to a layoff in 2009 is not relevant to the
question of whether she became disabled in 2011.  <u>See</u> Pl.'s Mem.
18.

The cases the Commissioner cites to refute this point, <u>see</u>
Def.'s Mem. 16, are not to the contrary.  In both of the cases
the Commissioner cites, the claimant quit work voluntarily after
his or her disability arose, and the court found that leaving
work of one's own volition rather than at the recommendation of
a treating physician supported a finding of no disability.  <u>See</u>
<u>Cauthen</u> v. <u>Finch</u>, 426 F.2d 891, 892 (4th Cir. 1970); <u>Fulbright</u>
v. <u>Apfel</u>, 114 F.Supp.2d 465, 476 (W.D.N.C. 2001).

[10] Two cases in this District support this specific
conclusion.  In <u>Resendes</u> v. <u>Astrue</u>, 780 F.Supp.2d 125 (D. Mass.
2011) (Gertner, J.), that court rejected the hearing officer's

credibility determination is not supported by substantial
evidence.

###    C.    Reliance on Vocational Expert Opinion

Vega argues that the hearing officer erred by relying on
the testimony of a vocational expert, whose opinion was premised
on "flawed" and incomplete information about Vega's condition,
as communicated to him by the hearing officer.  Pl.'s Mem. 19-
20.

Reliance on the testimony of a vocational expert is proper
only if that expert is provided with an accurate assessment of
the claimant's residual functional capacity.  See Rose v.
Shalala, 34 F.3d 13, 19 (1st Cir. 1994) (finding hearing
officer's reliance on vocational expert's testimony misplaced,

---

credibility determination because the hearing officer's
"conclusory finding on [the claimant's] credibility [wa]s
followed by a list of medical reports that found only mild
limitations -- implying that her testimony was not credible
because it was inconsistent with her medical evaluations."  Id.
at 141.  The Resendes court reasoned that the hearing officer's
"broad implication that the medical record belies [the
claimant's] testimony does not constitute a 'sufficiently
specific' rationale for the [hearing officer's] decision."  Id.
(internal footnote omitted).  Similarly, in Larlee v. Astrue,
694 F.Supp.2d 80 (D. Mass. 2010) (Tauro, J.), that court
reversed the hearing officer's finding that the claimant was not
credible, where the hearing officer "merely set[] forth an
unsupported conclusion" that the claimant was "not entirely
credible" and failed to discuss "any aspect of [the claimant's]
day-to-day activities" or make "specific findings which would
indicate . . . how those activities might demonstrate that [the
claimant's] subjective complaints were not credible."  Id. at
86.

where hearing officer's hypothetical failed to account for "a significant functional limitation"); Bourinot v. Colvin, 95 F.Supp.3d 161, 182-83 (D. Mass. 2015) (Hillman, J.) ("For a vocational expert's opinion to constitute substantial evidence, the testimony regarding an individual's ability to perform jobs in the national economy must come in response to a hypothetical question that accurately describes the claimant's impairments."). In determining an individual's residual functional capacity, a hearing officer may only consider "evidence [that] adequately discusse[s] [the] claimant's exertional impairments in functional terms. Since bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess claimant's residual functional capacity based on the bare medical record." Berrios Lopez v. Sec. of Health and Human Servs., 951 F.2d 427, 430 (1st Cir. 1991).[11]

To arrive at his conclusion regarding Vega's residual functional capacity, the hearing officer in this case apparently "considered all symptoms and the extent to which these symptoms

---

[11] This principle, of course, is not without limits. See, e.g., Gordils v. Sec. of Health and Human Servs., 921 F.2d 327 (1st Cir. 1990) (noting that a hearing officer is not "precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as [she] does not overstep the bounds of a layperson's competence and render a medical judgment").

can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as "opinion evidence[.]"  Admin. R. 19-20.  At the hearing, he posed two hypothetical scenarios to the vocational expert.  The first asked the expert to consider "a hypothetical person . . . who can perform a light level of work" and is limited to jobs that involve "occasional stooping, kneeling, crouching, and crawling[,]" "simple work instructions," and "frequent, but not constant, reaching in all directions."  Id. at 69-70.  A second hypothetical asked the expert to imagine the same hypothetical restrictions "but reduce the exertional limitation to sedentary."  The vocational expert testified that jobs existed at each of these levels, but that no jobs existed that would permit an employee to recline for an hour each day (on top of scheduled breaks) or to miss work two or more days per month. Id. at 70-71.

The Court is persuaded by Vega's argument that the hearing officer's proffered residual functional capacity is not supported by substantial evidence.  Pl.'s Mem. 19.[12]  Because the

---

[12] Vega also argues that the hypothetical posed to the vocational expert failed to include "all of the mental limitations he found for Vega[.]" Pl.'s Mem. 19.  This argument fails, however, because the finding concerning Vega's mental capacity that the hearing officer omitted from his hypothetical was not part of his residual functional capacity determination. See Admin. R. 19; Def.'s Mem. 17-18.

hearing officer was not empowered to interpret raw medical data, he was required to base his residual functional capacity determination on expert opinion as to Vega's limitations.  See Beyene v. Astrue, 739 F.Supp.2d 77, 83-84 (D. Mass. 2010) (holding hearing officer's residual functional capacity determination was not supported by substantial evidence and remanding "for development of functional evidence" where the determination was not based on an expert's assessment of the claimant's functional limitations).  Dr. Tiesi's assessment of Vega's functional limitations is inadequate, on its own, to support the hearing officer's residual functional capacity determination since Dr. Tiesi expressly declined to opine on Vega's rheumatological symptoms.  Admin. R. 491.  Moreover, even Dr. Tiesi's opinion does not support the hearing officer's residual functional capacity determination.  The hearing officer found that Vega could "stand and/or walk for 6 hours in an 8-hour workday" and could "lift and/or carry . . . 10 pounds frequently[.]"  Id. at 19.  Dr. Tiesi's evaluation, however, indicates that Vega is capable of standing or walking for only 4 hours, and of lifting 10 pounds only occasionally.  Id. at 495.

Because the hearing officer transmitted a flawed residual functional capacity to the vocational expert, his reliance on the vocational expert's testimony is misplaced.  See Aguiar v. Apfel, 99 F.Supp.2d 130, 139 (D. Mass. 2000) (Tauro, J.).

D.    **Reversal Versus Remand**

Although Vega asks this Court to reverse the Commissioner's decision and order the Commissioner to award her benefits, under these circumstances, remand, rather than reversal, is proper.  A court may order the Commissioner "to provide the relief it denied only in the unusual case in which the underlying facts and law are such that the agency has no discretion to act in any manner other than to award or deny benefits." Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001). The Court here takes issue with the basis for the hearing officer's decision; it does not follow from the Court's conclusion that the hearing officer's findings were not supported by substantial evidence that Vega is necessarily entitled to benefits.  Accordingly, the appropriate course of action is to remand.  See id. ("[I]f an essential factual issue has not been resolved . . . and there is no clear entitlement to benefits, the court must remand for further proceedings.").

**V.    CONCLUSION**

For the foregoing reasons, the decision of the hearing officer is vacated and the case is remanded for further proceedings.  Vega's motion for judgment on the pleadings, ECF No. 9, is GRANTED to the extent that the Court orders the alternative relief sought in her memorandum, see Pl.'s Mem. 20. The Commissioner's motion to affirm its decision is DENIED.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE